**Andrew L. FREESE 2d**

v.

**The UNITED STATES.**

No. 334–78.

United States Claims Court.

July 23, 1984.

Andrew L. Freese, 2d, pro se.

Ronald G. Gluck, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II,· Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

The plaintiff, proceeding *pro se* in this inverse condemnation case, seeks to recover from the United States just compensation for the purported taking of five unpatented mining claims located on national forest lands in the State of Idaho. In the event the five mining claims have not been taken by inverse condemnation, the plaintiff also argues that at the very least, the Government took or was required to take a scenic easement over the five mining claims for which he is owed just compensation. The case is presently before the Court on cross-motions for summary judgment.

For the reasons discussed in this opinion, defendant's motion for summary judgment is granted, the plaintiff's cross-motion is denied and the complaint will be dismissed.

*Facts*

The plaintiff, Andrew L. Freese, 2d, is the owner of five unpatented lode mining claims located on federally-owned lands in the State of Idaho.[1] Plaintiff located the first of these claims in September 1955 and the last in September 1970. Plaintiff never advanced these claims to patent. These unpatented claims have been examined by United States Forest Service (Forest Service) mineral examiners and found to have sufficient mineral content to be valid mining claims. Consequently, they have not been contested by the Government.

On July 24, 1978, plaintiff filed the instant case with the United States Court of Claims. Count I of the complaint alleged that the enactment of Pub.L. No. 92–400, 86 Stat. 612 (1972) (codified at 16 U.S.C. §§ 460aa to 460aa–14 (1982)), and known as the Sawtooth Act, which foreclosed plaintiff from patenting his claims, effected a taking of those claims, requiring payment of just compensation. Count II alleged that the Government took, or was required by law to take, a scenic easement over plaintiff's claims through regulation of improvements to and construction on the mining claims. Count III alleged that continuing governmental regulation and administration of plaintiff's mining claims constituted an unconstitutional taking of the claims by inverse condemnation.

The complaint originally alleged the taking of some 31 unpatented lode mining claims and 5 unpatented mill site claims. On November 9, 1979, the Court of Claims dismissed those parts of plaintiff's complaint that related to all 5 mill site claims and 26 of the lode claims, as the Department of the Interior had previously declared those claims null and void. The Court found those administrative agency decisions were entitled to finality as they had not been appealed to the appropriate federal court. *Freese v. United States,* 221 Ct.Cl. 963 (1979).

Thereafter, on January 28, 1981, the Court of Claims granted defendant's second motion for partial summary judgment and dismissed Count I of plaintiff's complaint. The Court indicated that since plaintiff had not advanced his unpatented mining claims to patent prior to the enactment of the Sawtooth Act, the loss of his right to patent his claims thereafter was not a taking by the Government that mandated just compensation. It was merely a loss of an opportunity to gain greater rights in the property. *Freese v. United States,* 226 Ct.Cl. 252, 639 F.2d 754, *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981).

Defendant has now filed a third motion for summary judgment on the remaining Counts II and III of the complaint, to which plaintiff has responded by filing a cross-motion for summary judgment.

In enacting the Sawtooth Act in August of 1972, Congress incorporated the lands upon which plaintiff's claims were located into the newly-created Sawtooth National Recreation Area (SNRA). Pub.L. No. 92–400, 86 Stat. 612 (1972) (codified at 16 U.S.C. §§ 460aa to 460aa–14 (1982)). The Sawtooth Act provided for the withdrawal of all lands within the recreation area from "all forms of location, entry, and patent under the mining laws of the United States." 16 U.S.C. § 460aa–9 (1982). Accordingly, holders of existing claims lying within the SNRA were precluded from patenting their claims. Plaintiff's claims were among those affected by passage of the Act. The Act, however, did not extinguish plaintiff's property interest in his previously-located unpatented mining claims. *See id.* Plaintiff was still free to perform his mining activities on those unpatented mining claims, provided he conformed to the applicable rules and regulations pertaining to the national forests in general and the Sawtooth Act in particular.

With the enactment of the Sawtooth Act, Congress directed the Secretary of Agriculture to administer the recreation area in accordance with the rules and regulations applicable to the national forests. *Id.* § 460aa–1(a). Among the applicable regu-

---

**1.** Plaintiff's claims are designated Pole, Pole No. 2, Pole No. 17, Ura No. 3, and Ura No. 12.

lations were the provisions of 36 C.F.R. § 251.1, which required users of the national forests to obtain a special use permit prior to entering onto and using such lands. Pursuant to the authority of these regulations, the Forest Service issued a news release on July 10, 1972 providing:

[A]ll prospectors and miners who plan to operate on National Forest lands in the Intermountain Region are required to obtain a Forest Service special use permit for access to their claims.

Such a permit is necessary before a prospector or miner begins to construct or maintain a road or to use any cross-country access or facility construction that would cause surface disturbance or vegetative removal to or across an unpatented mining claim, prospecting area, or to a patented mining claim within the National Forests of the Region.

On May 8, 1973, the Secretary issued a closure order for the SNRA. This order restricted the use of motorized equipment within the area to roads and trails already open to such uses, and to work on unpatented mining claims in conformance with a permit issued by the Area Ranger. Mining operators were required to notify the Area Ranger of their intention to operate their claim and to obtain all the necessary permits prior to beginning operations.

On August 28, 1974, the Secretary of Agriculture promulgated formal regulations setting forth rules and procedures governing surface uses of national forest lands in connection with authorized mining activities. 39 Fed.Reg. 31,317 (1974) (originally codified at 36 C.F.R. part 252 (1975)). These regulations required that mining operators intending to conduct operations within the national forests file with the Forest Service a notice of intention to operate. In the event Forest Service officials determined that the proposed activities would likely cause substantial disturbance of surface resources, the operator would be required to submit a more detailed operating plan for review and approval. 36 C.F.R. § 252.4(a) (1975).

The regulations required that the operating plan include a map or sketch sufficient to locate the area of proposed operations, indicating existing and/or proposed access roads. The regulations further required the operator to provide written information sufficient to identify the type of operations proposed and how they would be conducted, the method of transportation to be used, a timetable of when the activity would take place and the measures the operator planned to take to meet requirements for environmental protection. *Id.* § 252.4(c); *see id.* § 252.8(a)–(h) (specific guidelines and requirements for environmental protection). Following submission of the operating plan, Forest Service officials were required to review the plan and analyze the potential for damage to surface resources. Within 30 days of receipt of the plan, the Forest Service was required to notify the applicant of approval, approval with modifications or rejection of the plan. *Id.* § 252.5(a)(1)–(5).

Since 1972, plaintiff and the Forest Service administrators of the SNRA have clashed continuously over the manner in which plaintiff may develop his mining claims. The areas of contention are varied and numerous. They have included, among others, disputes over road construction and maintenance, disputes over the authority of the Forest Service to conduct mineral examinations, disputes over whether special permits and operating plans are required, disputes over surface construction of tool sheds and other buildings, disputes over road closings and lockouts, and disputes over plowing snow.

On May 28, 1972, plaintiff wrote to the Forest Service at its Sawtooth Station Office in Ketchum, Idaho, to request a permit to complete an extension of an access road to his tungsten (Ura) claims. The road in question was known as the Little Beaver Creek road. Mr. Freese's letter did not provide any specific information concerning the exact location of the proposed construction or the method of construction. On June 30, 1972, the Superintendent of the Sawtooth Valley Ranger District (Superintendent) responded to Mr. Freese request-

ing specific information for his proposal, and informed him that a special use permit was required for the construction and maintenance of roads across national forest lands. The Superintendent's letter also stated: "We would appreciate meeting with you or your designated representative on the claims at an early and mutually convenient date. At that time, our mining engineer will examine the claims in question and discuss with you the present need for road access."

In June 1972, a proposal to establish the SNRA was at that time pending before Congress. Mr. Freese's Ura group and Pole group of unpatented mining claims were within the proposed boundaries of the SNRA. Starting around June 1972 and proceeding thereafter, the Forest Service had begun to conduct mineral examinations of mining claims to verify the need for mining road construction or any other proposed mining activities that could result in significant disturbance of the surface of national forest lands within the proposed boundaries of the SNRA. In the event the unpatented claims were found to have insufficient minerals to justify the claim, the claim would be contested by the Government and no construction or access permits would be issued.

By letter dated July 10, 1972, the plaintiff responded: "As far as yet additional mineral inspections, my idea is that the claims hav [sic] been examined enuf [sic] already * * *." He also indicated in the letter that he had "flagged" the proposed road extension, and that he had been maintaining the existing Little Beaver Creek road for years without permission from the Forest Service. Apparently, Mr. Freese felt that flagging the road for the Forest Service was enough explanation of need for them and he did not attempt to set up a meeting for the purpose of the mineral examination or for the on-site inspection of the proposed construction of the road extension.

Subsequently, on August 14, 1972, the Superintendent responded with a letter, attaching materials detailing the Forest Ser-

vice's policy with regard to issuance of special use permits. The letter stressed the need for plaintiff to obtain a permit before beginning work, as well as the desirability of plaintiff's meeting with the Forest Service Zone Manager to clarify issues relating to the proposed construction and maintenance of the access road.

The Forest Service heard nothing further from Mr. Freese until the following spring. On March 29, 1973, the plaintiff again wrote to the Forest Service at the Sawtooth office and inquired whether the Service had "looked over" his requested road extension construction for Little Beaver Creek road that he had flagged. He also requested in the same letter special permits to maintain both the existing Little Beaver Creek road to his Ura claims, and the existing Pole Creek road to his Pole claims. He also mentioned for the first time that he had visited the office of an attorney from Pocatello, Idaho, who had been successful in getting condemnation awards for several other miners in the region. Mr. Freese's March 29 letter ignored the Forest Service's standing request for a mineral examination of his Ura claims as an essential part of the processing of his Little Beaver Creek road extension request of May 28, 1972.

Following the plaintiff's special use permit request of March 29, 1973, the Forest Service responded with a series of letters to Mr. Freese dated April 27, June 8, and July 18, 1973. All of these letters had the common theme of requesting the plaintiff's cooperation to meet with named Forest Service officials for on-site mineral examinations of his claims and on-site inspection of his road maintenance and extension construction proposals. The April 27 letter specifically referenced the plaintiff's March 29 letter, and advised plaintiff that he had yet to submit a formal application for his various requests. The Forest Service enclosed copies of the appropriate application forms for the plaintiff's convenience. The June 8 letter was in response to a letter received by the Forest Service from Senator McClure of Idaho on Mr. Freese's be-

half, inquiring about the plaintiff's access to his claims and the potential for Forest Service purchase (condemnation) of the plaintiff's claims. The letter concluded:

The Sawtooth National Recreation Area officials will be glad to cooperate with you in solving your access and validity problems. However, it is necessary that you meet with them to examine the claims and file the necessary application and information previously requested for the special-use permit.

Thus, Mr. Freese was informed on April 27 and June 8, 1973, that he had neither submitted special use permit applications nor agreed to the requested on-the-ground inspections and that no action would be taken without the completed applications, supporting data, and mineral examinations.

Following receipt of these letters, the plaintiff finally, on June 25, 1973, filled out the special use application forms that were sent to him and forwarded them to the SNRA office. These applications, however, pertained only to the road maintenance activities mentioned in plaintiff's March 1973 letter to the Forest Service. By letter dated July 18, 1973, the Superintendent of the SNRA acknowledged receipt of the forms and advised the plaintiff that his road maintenance proposals for the existing Pole Creek and the Little Beaver Creek roads could be processed without mineral examinations but that an on-site inspection of the roads with Mr. Freese present was essential. In addition, the Forest Service emphasized again that no new road construction would be permitted on plaintiff's Little Beaver Creek road extension request until mineral examinations were run on his Ura claims to establish the validity of those claims. The letter did go on to grant the plaintiff access authorization to his claims for July 15, 1973 through September 30, 1973 and to conduct mining activities there that did not significantly disturb the surface environment on his claims. The Superintendent's letter concluded: "I also urge you to contact Harry B. Young, Minerals Management Assistant-SNRA, and discuss the SNRA minerals Management program. * * * I feel this discussion

could answer your questions and clear up those points that are bothering you. * * * If you have any questions, please feel free to contact me."

Thereafter, on Friday, September 28, 1973, plaintiff wrote the Superintendent to inform him that he was available to meet with Forest Service officials the following Tuesday, October 2, at 1:00 p.m. In his letter, plaintiff restated his objections to the need for a special use permit. The letter, however, did not arrive in time to permit the appropriate Forest Service officials to meet with Mr. Freese on October 2.

On October 29, 1973, the Superintendent responded to the plaintiff's letter of September 28, advising that he must allow more time for the mail to arrive and schedules to be arranged if he desired an appointment. A telephone number was provided plaintiff for this purpose. The letter also extended plaintiff's access and claim assessment and maintenance authority to October 1974. In addition, the plaintiff was advised that the general public, including himself, was allowed to use those roads posted as "open" on the May 8, 1973, SNRA Closure Map without a special use permit as long as the use conformed to the limitations set forth in the May 8, 1973 Closure Order, other Forest Service rules and regulations, and federal laws. He was also specifically reminded that the use of "open" Forest Service roads did not include road maintenance and construction, and that road maintenance work would not be authorized until the validity of his claims had been established by a mineral examination and there had been a field inspection of the proposed maintenance work. Finally, the Superintendent closed the letter with his belief that:

[M]ost if not all of your questions and apparent problems could be quickly and effectively resolved if you would please meet with T. Kovalicky, Program Management Assistant and H. Young, Minerals Management Assistant at a mutually convenient time. Therefore I urge you to do so as soon as possible. It would also be beneficial to set a mutually con-

venient date to conduct an on-the-ground mineral examination of your unpatented lode claims and your mining road access problems. By doing this we will be able to resolve the matters which appear to be bothering you.

The Forest Service next heard from the plaintiff some nine months later when he wrote a letter dated June 1, 1974, offering to meet with SNRA officials to go over his road maintenance proposals for access to his Ura and Pole claims. Plaintiff asserted, however, that the Forest Service had no authority to conduct a mineral examination of his claims, maintaining that that authority rested solely with the Department of the Interior.

The Forest Service responded by letter dated June 12, 1974, setting up an appointment to go over his access road maintenance proposals on June 21, 1974 at 10 a.m. On that date, Mr. Freese met with Forest Service officials including Mr. Jerry Green, Wood River Zone Manager, Mr. Harry Young, Mineral Management Assistant and Mr. Jeff Jones, Mineral Examiner, and proceeded with the on-site inspection of the Pole Creek road leading to plaintiff's Pole claims and later that day, the Little Beaver Creek road leading to the plaintiff's Ura claims. Also at that time, a preliminary mineral examination was conducted on plaintiff's Ura No. 12 claim to determine the extent of the mineral content. The parties discussed the proposed access road maintenance proposals and road extension construction proposal in depth. The Forest Service officials again explained why it was necessary for mineral examinations to be conducted as part of the permit process. Mr. Freese was encouraged to again meet with them on July 22, 1974 when the Forest Service had scheduled mineral examinations for the remainder of plaintiff's claims on both the Pole and Ura locations. Plaintiff was advised that if he could not be present, he should designate a representative to act in his behalf. Thereafter, at various times from July 22 through September 25, 1974, mineral examinations of plaintiff's Pole claims were conducted. Plaintiff did not attend any of these exami-

nations nor did he designate a representative that would act in his stead.

The mineral examinations revealed sufficient mineral values on the three Pole claims and the Ura No. 12 claim to negate a contest of those claims by the Government. Plaintiff was notified in a January 16, 1975 letter, however, that a complete examination of the Ura No. 3 and No. 12 claims had not been effected. The Forest Service again sought plaintiff's cooperation in conducting an examination on the Ura No. 12 claim, but observed that the examination would be conducted without plaintiff being present, if necessary. However, such an examination without the plaintiff being present made the examination much more difficult and time consuming.

Based on the on-site inspection and discussions between the parties, the plaintiff, by letter dated June 25, 1974, was authorized to use the existing Pole Creek road to his Pole claims for the period from June 24, 1974 through October 31, 1974. Plaintiff was advised that no action could be taken relative to construction of the proposed extension of the existing Little Beaver Creek road to the Ura claims until the mineral examination and analysis were complete. Plaintiff was reminded, however, that he was free to use the existing portion of the Little Beaver Creek road then open to the public.

In a letter dated July 22, 1974, plaintiff was again requested to submit a special use permit application covering his proposal to extend the existing Little Beaver Creek road leading to his Ura claims. In this letter, plaintiff was informed of the need for an environmental analysis report, as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., for the proposed road. On July 27, 1974, plaintiff submitted the requested application.

As indicated on January 16, 1975, the Forest Service notified the plaintiff that sufficient mineral values had been found in his three Pole claims and Ura No. 12 claim to negate any Government contest of those claims. Therefore, on March 6, 1975, the

Forest Service advised plaintiff that it would issue a special use permit for construction of the access road to plaintiff's Ura claim. Thereafter, on April 17, 1975, plaintiff was sent two copies of a permit for the proposed extension of the Little Beaver Creek access road with instructions to sign and return both copies. Plaintiff, however, returned the permit unsigned, noting that "it is more prohibitory than regulatory. * * * The terms and conditions are unacceptable * * *." Plaintiff was apparently concerned primarily about two aspects of the permit. First, he refused to conform to the returnable reclamation bond requirement that would cost $1,000. Second, he felt that the Forest Service should authorize new construction to correct a portion of the road that had a steep 28.5 percent grade. The Forest Service position on these points were that the reclamation bond was standard business practice and authorized by appropriate regulations, and that the steep grade was safe and could be utilized by the plaintiff at this stage of the development of his claims without difficulty.

On April 10, 1975, plaintiff proposed new activities for the development of his Ura and Pole claims. Plaintiff's application consisted of formal notices of intention to operate (NOI) as required by Forest Service regulations. In the NOI relating to the Pole claims, plaintiff proposed to construct a tool house. Plaintiff also proposed the installation of four culverts at three sites on the claims. In the NOI relating to plaintiff's Ura claims, plaintiff proposed construction of an access road and installation of a culvert.

The Sawtooth Superintendent transmitted a response to plaintiff by letter dated April 18, 1975. With regard to the Ura claims, the Superintendent wrote that the validity of plaintiff's Ura No. 3 claim had yet to be verified. The Superintendent requested plaintiff to accompany the Forest Service mineral examiner to the claim for an on-site examination. With regard to installation of any culverts, the Superintendent noted that engineering personnel from his office would have to evaluate the project before approval could be granted. As to proposed operations on the Pole claims, the Superintendent advised plaintiff that permission to use a road which previously had been closed would be granted as soon as the road bed was sufficiently dry to accommodate traffic without resulting resource damage. Another road would also remain closed to traffic until its surface stabilized. Plaintiff was also advised that approval for the installation of culverts at the Pole claims could not be granted until plaintiff met with Forest Service personnel to explain how and where the culverts would be installed. With regard to plaintiff's proposal to construct a tool shed, the Superintendent informed plaintiff that more information was needed to evaluate the proposal.

In a May 2, 1975 letter, plaintiff generally identified the location of the culverts and the proposed method of installation. With regard to the tool shed, plaintiff stated that "[t]he size of the edifice (an irrelevant matter) is not to exceed $1500' \times 600'$—likely smaller at the election of the undersigned, say, $20' \times 11'$ inside; material wood, metal, & glass, style plain, permission to construct already granted by CONGRESS." In response, the Superintendent again notified plaintiff on May 14, 1975 that an on-site inspection was necessary to evaluate the proposal for installation of culverts. The Superintendent also stated that "[t]he information we requested concerning the tool shed * * * is needed for us to determine the impact upon natural surface resources as directed by the 9–1–74 USDA rules on prospecting, exploration and mining procedures and PL 92–400." The Superintendent further advised plaintiff that the Forest Service had no intention of managing mineral resources within the SNRA, but would continue to manage and protect the surface resources in the national forests, irrespective of uses and users.

There followed a flurry of letters back and forth during the summer of 1975 between the plaintiff and the Forest Service, all of which related to more information and meetings the Forest Service said it

needed to evaluate the plaintiff's mining proposals. By letter dated July 16, 1975, Mr. Freese notified the Forest Service of his intention to open pit mine the Pole, Pole No. 2, Pole No. 11 and Pole No. 18 lode claims and to mine the other Pole claims by underground methods. All of these operations were to be supported by housing, storage facilities, mills, etc. This proposal was not accompanied by any maps or engineering data to support plaintiff's plans or the information requested in response to plaintiff's April 10, 1975 notice of intention to operate. The Forest Service advised Mr. Freese on July 23, 1975, that his July 16, 1975 proposal(s) would certainly cause "significant disturbance of surface resources" and he would have to submit an operating plan as required by 36 C.F.R. § 252. Mr. Freese was again reminded of this requirement at meetings held with him on August 11 and September 18. Following these meetings, and the summer letters, the Forest Service issued an authorization for plaintiff to install culverts at three sites on his Pole claims and at one site on the Ura claims.

On September 29, 1975, plaintiff submitted an "Addenda to Notices of Intent to Operate." This addenda, which related to the Pole claims, did not include an additional NOI or operating plan, but nevertheless proposed new activities such as construction of tunnels, buildings and open pit mining. On October 15, 1975, the Forest Service notified plaintiff by certified mail that he would have to submit a plan of operations as required by regulation and would need to meet with Forest Service officials at the claim sites.

On January 27, 1976, plaintiff forwarded the operating plan to the Forest Service. This plan included no timetable for operations, no maps, nor specific information to enable the Forest Service to evaluate the surface impact of plaintiff's proposed activities. On February 27, 1976, the Forest Service advised plaintiff that "[t]he minimum information required on any operating plan far exceeds that which you submitted in your brief and totally inadequate 1–27–76 operating plan." Plaintiff was requested to supply additional, more specific information "in order to allow proper evaluation of your proposed operations * * *."

On March 4, 1976, plaintiff submitted on a single form a revised plan of operations covering both the Pole and Ura claim groups. Thereafter, on March 24, 1976, the Forest Supervisor returned the plan to plaintiff, noting that the "operating plan is grossly inadequate." Specifically, the Supervisor noted that the operating plan was defective because it lacked:

1. Maps of "appropriate" scale showing access, mine operations, disturbed areas, relationship of proposed operations to claims or unclaimed lands, work roads within claims, proposed structures.

2. A reasonable and accurate narrative on measures to be taken to protect surface resources and/or minimize surface disturbance.

3. An adequate map coverage of "appropriate" scale identifying roads of which you propose to maintain or reconstruct. Adequate narrative describing proposed road maintenance.

4. When and how you plan to install the culverts and when you plan to conduct the other mining related operations.

5. Description of method you propose to clean slough from cuts. Do you plan to do it by hand or use mechanized equipment?

6. Description of your proposed geochemical project. Do you plan to use any mechanized equipment or what?

7. You have included both the URA and Pole claim group operations on one operating plan. Submit them separately for clarity sake.

The Forest Supervisor included with his letter an example of an adequate and complete operating plan with supporting maps. He noted that "[h]opefully, these data will be of some assistance. If you still have trouble with the operating plan or notice-of-intention-to-operate, I suggest you make an appointment * * * and resolve the matter." The letter concluded, "Please contact me if you have any questions."

On June 24, 1976, plaintiff filed an action with the United States District Court for the District of Idaho seeking just compensation for the Government's purported taking of his mining claims and, additionally, seeking to enjoin the Forest Service from impeding plaintiff's access to his claims. That case was dismissed in March 1977 pursuant to a voluntary stipulation of dismissal. This action in the U.S. Court of Claims followed on July 24, 1978.

## Discussion

As earlier indicated, defendant has now filed for summary judgment on the remaining Counts II and III of the complaint. Plaintiff has responded by filing a cross-motion covering both counts. After careful consideration of the extensive submissions of the parties and the voluminous record which has been generated in this case, the Court has determined that defendant's motion should be granted, the plaintiff's motion should be denied, and the petition (now complaint) should be dismissed in its entirety.

Before this Court, defendant argues that there has been no compensable taking of plaintiff's mining claims. Specifically, defendant argues that the United States enjoys broad discretion to regulate and manage mining-related activities on federally-owned lands. Plaintiff's right to develop his mining claims is subject to that right, and plaintiff must comply with all applicable regulations. Defendant argues that any difficulty which plaintiff has encountered in developing his claims is due to plaintiff's own unwillingness to cooperate with Forest Service personnel and to comply with applicable regulations. Accordingly, defendant asserts, there has been no compensable taking of plaintiff's claims.

In substance, plaintiff counters that there has been a taking of his property requiring the payment of just compensation under the fifth amendment. Specifically, plaintiff asserts that he was denied useful access to his claims and was prevented from constructing needed improvements upon the claims. Plaintiff denies that he has failed to cooperate with Forest Service personnel. Rather, plaintiff argues, Forest Service personnel themselves have failed to adhere to Government laws and regulations and have interfered with plaintiff's right to develop his mining claims within the SNRA. Accordingly, plaintiff argues, there has been a taking of those claims. Plaintiff further argues that the Governmental regulation of improvements on his claims in effect took a scenic easement over plaintiff's mining claims, for which plaintiff should be compensated.

Before turning to the merits of the motions before the Court, it would be helpful to review the mining laws of the United States.

### I. The Federal Mining Laws

The federal mining laws authorize citizens of the United States to explore for, discover and extract valuable minerals from the public domain and to obtain patents, or fee title, to lands containing such mineral discoveries. See 30 U.S.C. § 22 (1982). Citizens may initiate mining claims upon federal lands by "prospecting for minerals thereon, and, upon the discovery of minerals, by locating the lands upon which such discovery has been made." 43 C.F.R. § 3831.1 (1983). Location of a claim is accomplished by staking the corners of the claim, posting notice and recording the claim in accordance with applicable state law. Id.

■■■ A validly located mining claim is, in the truest sense, an interest in real property. The locator (owner) of a claim has "the exclusive right of possession and enjoyment" for so long as federal laws and local regulations are complied with. 30 U.S.C. § 26 (1982); see Cameron v. United States, 252 U.S. 450, 460–61, 40 S.Ct. 410, 412–413, 64 L.Ed. 659 (1920); Skaw v. United States, 2 Cl.Ct. 795, 800 (1983), rev'd on other grounds, 740 F.2d 932 (Fed. Cir.1984); Freese v. United States, supra, 226 Ct.Cl. at 253, 639 F.2d at 755. The locator's possessory interest is only valid as to third parties, and, until the claim is advanced to patent, the United States retains superior rights in the property. See

*Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963); *Skaw v. United States, supra,* 2 Cl.Ct. at 800. With regard to unpatented claims, therefore, the Government retains the right to regulate disturbance of surface resources, as well as the right to permit uses of the surface area of the claim for purposes other than mining. *See* 30 U.S.C. § 612(b) (1982); *see also United States v. Richardson,* 599 F.2d 290, 294–95 (9th Cir. 1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980); *Skaw v. United States, supra,* 2 Cl.Ct. at 800.

With the enactment of the Surface Uses Act of 1955, Pub.L. No. 84–167, 69 Stat. 367 (1955) (codified as amended at 30 U.S.C. §§ 611–615 (1982)), Congress sought to strike a balance between the right of a locator of a mining claim to develop that claim and competing surface uses. Section 4(b) of the Act provides:

> Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States). Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, * * * to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land: *Provided, however,* That any use of the surface of any such mining claim by the United States * * * shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto * * *.

30 U.S.C. § 612(b) (1982).

### A. *Regulation of National Forest Lands*

█ As with other lands in the public domain, mineral-bearing lands in the national forests are open to citizens for purposes of prospecting, locating and developing mineral reserves. 16 U.S.C. § 478 (1982); 30 U.S.C. § 181 (1982). Persons entering the national forests for those purposes, however, are obligated to adhere to applicable rules and regulations governing the use of the national forests. 16 U.S.C. § 478 (1982). Section 551 of Title 16 of the United States Code provides the general authorization for the regulation of national forest lands. Section 551 provides in part:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depradations upon the * * * national forests * * and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction * * *.

Among the Secretary's obligations is a duty to ensure that no use of a national forest—whether recreational, commercial or mining-related—unnecessarily disturbs the surface resources. *Cf. United States v. Grimaud,* 220 U.S. 506, 522, 31 S.Ct. 480, 485, 55 L.Ed. 563 (1911).

Congress originally conferred upon the Secretary of the Interior the authority to promulgate regulations governing development of mineral claims within the national forests some 87 years ago. *See* 30 Stat. 35–36 (codified as amended at 16 U.S.C. §§ 478 & 551 (1982)). This authority was transferred to the Secretary of Agriculture in 1905. Pub.L. No. 58–34, 33 Stat. 628 (1905). Pursuant to this authority, the Secretary promulgated regulations in 1942 providing that "[a]ll uses of national forest lands, improvements, and resources * * * shall be designated 'special uses,' and shall be authorized by 'special use permits,'" 7 Fed.Reg. 7,178 (1942) (codified at 36 C.F.R. part 251). These regulations further provide that all such special use permits "shall be in such form and contain such terms, stipulations and agreements as may be required by the regulations of the Secretary of Agriculture and the instructions of the Chief of the Forest Service." Thereafter, in 1974, specific, detailed regulations gov-

erning mining activities on the national forest lands were promulgated. *See* 39 Fed. Reg. 31,317 (1974) (codified at 36 C.F.R. part 252); *see also United States v. Richardson, supra,* 599 F.2d at 292.

B. *Regulation Within the SNRA*

Congress created the Sawtooth National Recreation Area "[i]n order to assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values [of the area] and to provide for the enhancement of the recreational values therewith * * *." 16 U.S.C. § 460aa(a) (1982). The recreation area was placed under the management and control of the Secretary of Agriculture, who was directed to administer the area in such a manner as to provide for "the management, utilization, and disposal of * * * mineral resources insofar as their utilization will not substantially impair the purposes for which the recreation area is established." *Id.* § 460aa–1(a)(3). Congress further directed the Secretary to administer the area in accordance with the laws, rules and regulations applicable to the national forests. *Id.* § 460aa–1(a).

Until regulations governing mining uses of the SNRA could be promulgated, the Forest Service issued a closure order for lands, roads and trails within the area. The order stated in part:

Pursuant to the Act of August 22, 1972, establishing the Sawtooth National Recreation Area (86 Stat. 612) and the Regulations of the Secretary of Agriculture 36 C.F.R. 261.4 and 212.7(a)(3), the following rules applicable to National Forest lands, roads and trails within the Sawtooth National Recreation Area are hereby established:

\* \* \* \* \* \*

2. The use of motorized equipment on National Forest lands, roads and trails within the Sawtooth National Recreation Area, * * * is prohibited except (1) on roads and trails posted as open to such use and (2) use in conformance with a permit issued by the Area Ranger * * * in connection with development and assessment work on unpatented mining claims or other authorized or administrative uses of National Forest lands. * *

3. Claimants proposing to do exploration or assessment work on their mining claims will notify the Area Ranger of their intentions and obtain any necessary permits before using motorized equipment in the Sawtooth National Recreation Area for any purpose except travel on roads and trails open to such use. * *

On August 4, 1977, the Secretary of Agriculture promulgated regulations governing the use, management and utilization of national lands in the SNRA. 42 Fed.Reg. 39,387 (1977). The regulations, which are substantially similar to the regulations governing mining operations in the national forests, provide:

The use, management and utilization of natural resources on the Federal lands in the Sawtooth National Recreation Area (SNRA) are subject to the General Management Plan and the laws, rules, and regulations pertaining to the National Forests with the exception that Part 252 of this chapter does not apply to these resources. No use or disposal of such resources shall be authorized which will result in substantial impairment of the natural values of the Recreation Area.

36 C.F.R. § 292.17(a) (1983).

II. The Constitutional Framework

■ The fifth amendment to the Constitution provides that the Government may not take private property for a public use without just compensation. Although takings most frequently result from an exercise of the power of eminent domain, acts which have the effect of such an exercise may also result in a taking of property. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983); *see Eyherabide v. United States,* 170 Ct.Cl. 598, 601, 345 F.2d 565, 567 (1965).

■ It is now well established that governmental regulation can effect a taking of property. *Deltona Corp. v. United States,*

228 Ct.Cl. 476, 486, 657 F.2d 1184, 1190 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *see Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124–28, 98 S.Ct. 2646, 2659–2661, 57 L.Ed.2d 631 (1978). Although the Government's regulatory powers include the right to protect and promote the general public welfare, regulations which deny the landowner "economically viable use of his land" can result in a taking. *See Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Deltona Corp. v. United States, supra,* 228 Ct.Cl. at 486, 657 F.2d at 1190. Thus, when a regulatory scheme "goes too far," it will be recognized as a taking. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

In *Penn Central Transp. Co. v. New York City,* the Supreme Court observed that "this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government * * *." 438 U.S. 104, 124 (1978). The Court noted, however, that several factors are significant in determining whether a taking has occurred. One focus is the economic impact of the regulation on the property owner. In particular, a relevant inquiry is the extent to which the regulatory scheme interferes with "distinct investment-backed expectations." *Id.* The character of the governmental action also is relevant. The Court observed that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government * * * than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* The Court also observed that "government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have also been held to constitute 'takings.'" *Id.* 438 U.S. at 128, 98 S.Ct. at 2661.

The question of whether regulatory action constitutes a taking "necessarily requires a weighing of private and public interests." *Agins v. Tiburon, supra,* 447 U.S. at 261, 100 S.Ct. at 2141. The inquiry also must focus on the uses the regulations permit. *Penn Central Transp. Co. v. New York City, supra,* 438 U.S. at 131, 98 S.Ct. at 2662. Governmental regulation or action which is so burdensome and pervasive that the landowner is either denied the use of or access to his property may well constitute a taking requiring payment of just compensation. *Armijo v. United States,* 229 Ct.Cl. 34, 37, 663 F.2d 90, 93 (1981); *see Pennsylvania Coal Co. v. Mahon, supra,* 260 U.S. at 414–15, 43 S.Ct. at 159–160.

Because the inquiry into whether governmental action effects a taking by inverse condemnation is, for the most part, factually intensive, the Court of Appeals for the Federal Circuit has cautioned against "precipitous grants of summary judgment" in such cases. *Yuba Goldfields, Inc. v. United States, supra,* 723 F.2d at 887. Nevertheless, the Federal Circuit also has observed that there may be cases wherein the facts are clear and not disputed and it is possible to determine that a party is entitled to judgment as a matter of law. *Id.* This is such an instance. Also, it is useful to note at this point that both parties have moved for summary judgment in this action.

In the context of a motion for summary judgment, the court must determine as a threshold matter whether a genuine issue of material fact exists. *Johnson Controls, Inc. v. United States,* 1 Cl.Ct. 256, 257 (1982); *Garcia v. United States,* 123 Ct.Cl. 722, 732, 108 F.Supp. 608, 613 (1952). Any doubts, inferences, or issues of credibility must be resolved against the moving party. *See Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). The cross-motions for summary judgment presently before the Court raise issues regarding whether actions on the part of Forest Service officials in regulating and administering the SNRA have effected a taking of

plaintiff's unpatented mining claims. Defendant's motion is supported by two affidavits of Harry B. Young, formerly the Sawtooth National Forest Mining Engineer. Mr. Young's first affidavit is accompanied by a voluminous informal administrative record of some 63 attachments consisting primarily of correspondence between plaintiff and Forest Service officials. These attachments total some 300 pages. Plaintiff's cross-motion for summary judgment is in turn supported by plaintiff's affidavit, to which is attached various supporting material. This Court's examination of the submissions of the parties has revealed that the material facts necessary for consideration of the present motion are clear and undisputed. This case is, therefore, ripe for summary disposition.

### III. Plaintiff's Count III: The Taking Claim

As discussed previously, plaintiff's property interest in his unpatented mining claims is possessory only. The United States retains legal title to the lands upon which the mining claims are located and may regulate substantial disturbance of the surface resources. *See* 16 U.S.C. § 551 (1982) (Secretary of Agriculture shall provide for protection of national forest lands); 16 U.S.C. § 529 (1982) (Secretary is directed to administer surface resources to achieve multiple uses); 30 U.S.C. § 612(b) (1982) (rights under unpatented mining claims subject to right of United States to manage surface resources); *see also Skaw v. United States, supra,* 2 Cl.Ct. at 800. Accordingly, officials of the Forest Service enjoy broad discretion to regulate the manner in which mining activities are conducted on the national forest lands. The Sawtooth Act specifically extended this regulatory authority to encompass lands within the SNRA, which itself was created by consolidation of several national forests.

Plaintiff asserts that the Secretary's regulations, and the Forest Service's administration of those regulations, has overstepped the boundary between appropriate regulation and actual management by the Government of mineral resources. In this regard, plaintiff argues that he has been denied usable, year-round access to and use of his claims. Plaintiff also contends that the Forest Service has taken his claims by conditioning their development upon the issuance of permits which contain overly restrictive terms and conditions.

This Court's examination of the parties' submissions, plaintiff's responses to defendant's requests for admissions and the voluminous informal administrative record of plaintiff's correspondence with Forest Service officials reveals that, as a matter of law, there has been no compensable taking of plaintiff's unpatented mining claims. Without question, Forest Service regulation of surface uses of lands within the SNRA has, to some extent, frustrated plaintiff's plans for his mining properties. The essential attributes of plaintiff's property rights, however, have not by any means been extinguished, and plaintiff retains "economically viable use" of his mining claims. *See Agins v. Tiburon, supra,* 447 U.S. at 260, 100 S.Ct. at 2141.

This is not a case in which an individual has been deprived of the use of his property. By law, the only property right plaintiff has in his unpatented claims is a right to possession for purposes of developing and extracting mineral resources. *See Best v. Humboldt Placer Mining Co., supra,* 371 U.S. at 335–36, 83 S.Ct. at 381–382; *Skaw v. United States, supra,* 2 Cl.Ct. at 800. Without question, that right was, and is, subject to the superior right of the United States to regulate uses of the surface resources within the SNRA. Although Forest Service regulation of such surface uses has affected the manner in which plaintiff may develop his claims, it has not deprived him of the ability to develop the claims. The plaintiff may still develop his valid mining claims any way he sees fit, provided he cooperates with the Government and does not take actions that will unreasonably scar and deface the surface of his claims and access to these claims.

The statutory mandate of the Forest Service is to protect the surface resources of the SNRA. Forest Service requirements that mining operators working within the SNRA obtain special use permits and submit notices of intention to operate and, in some circumstances, operating plans, are designed to carry out this mandate. The requirement for special permits and plans of operation ensures the ability of Forest Service officials to evaluate whether the proposed mining operations will result in significant disturbance of surface resources. The requirement also enables the Forest Service to suggest less disruptive means of conducting the proposed activities.

This Court's examination of the record of communications and actions between plaintiff and the Forest Service reveals that the major source of difficulty between plaintiff and Forest Service officials has been focused around plaintiff's responses to Forest Service requests for information sufficient and necessary to evaluate plaintiff's proposed operations within the SNRA. On numerous occasions, plaintiff was requested to furnish information sufficient to permit a meaningful analysis of whether plaintiff's proposed plan of operations would result in adverse impact upon SNRA surface lands. Plaintiff, in almost all circumstances, failed to furnish such information, or was late or evasive. Plaintiff cannot refuse to cooperate with the administrators of the SNRA and then be heard to complain that the Forest Service has denied him access to and the ability to develop his claims. That is what this case comes down to—*i.e.,* a clear case of lack of cooperation on the part of the plaintiff.

The record discloses that when plaintiff has cooperated with the Forest Service, even if belatedly, he has received the necessary authorizations. For example, in May of 1972, plaintiff initially sought authorization to construct an extension to the Little Beaver Creek access road to his Ura No. 12 mining claim. Within a month, the Forest Service had responded to the plaintiff's request by advising him that a special permit to accomplish the construction would be required, along with a mineral examination of his Ura No. 12 claim and an on-site inspection and discussion of his proposal with the Forest Service. Plaintiff finally agreed to meet with the appropriate Forest Service officials on site on June 21, 1974 to discuss the road extension proposal and to take a sampling of the Ura No. 12 mineral content. He thereafter submitted the required special permit application on July 27, 1974, some two years after he had initially proposed the road extension. Following completion of an environmental analysis report and after receipt of the valid mineral inspection report for the Ura No. 12 claim, the Forest Service notified the plaintiff in March 1975 that his special use permit would be approved. Although this authorization was granted, the plaintiff subsequently refused to accept it, complaining that the "terms and conditions" were prohibitory. The prohibitory terms had to do with payment of a $1,000 reclamation bond and the refusal by the Forest Service to allow new construction which would alleviate a 28.5 percent grade rise at one point on the road.

The record is also clear that authorizations issued even when the plaintiff failed to cooperate with the Forest Service. Throughout the 1972–76 period of time at issue here, the Forest Service repeatedly advised the plaintiff that mining authorizations and special use permits for construction and maintenance of roads depended to a large extent on the completion of mineral examinations on his claims. Plaintiff, however, with one exception—the Ura No. 12 claim—consistently refused to meet with the Forest Service for the purpose of conducting these examinations, maintaining throughout that the Forest Service had no authority to conduct such examinations. Such authority questions have already been tested and found to be wanting. *See United States v. Andrew L. Freese, 2d,* 37 IBLA 7 (1978). In any event, the plaintiff refused to cooperate with the Forest Service in the conduct of these mineral examinations.

The Forest Service finally concluded that the mineral examinations would have to be unilaterally scheduled. The Forest Service thereafter notified the plaintiff as to when the claims were to be examined and invited his presence. Although the plaintiff did not show up, rendering each examination much more difficult and time consuming, the examinations were conducted. Twenty-six of the plaintiff's 31 claims were found to have insufficient mineral content and were successfully contested by the Government. Five of the plaintiff's mining claims were found to be valid and were not so contested. As to these five claims (Pole, Pole No. 2, Pole No. 17, Ura No. 3, and Ura No. 12), road access and mining authorizations were issued by the Government, even in the face of the plaintiff's almost total lack of cooperation.

Likewise, in April of 1975, plaintiff submitted formal notices of intention to operate. In these notices, he requested permission to install several culverts in various locations on his claims. In a May 14, 1975 letter, the SNRA Superintendent informed plaintiff that authorization to install the culverts· would not be forthcoming until engineering personnel from the Forest Supervisor's office met with plaintiff for an on-site inspection. Although plaintiff apparently never participated in an on-site inspection, the Forest Service nevertheless conducted its own evaluation and issued the authorization which plaintiff had sought.

Further, the Forest Service also authorized plaintiff, without prior request, to perform certain maintenance, exploratory and assessment work on his claims for the period from July 15, 1973 through September 30, 1973. Thereafter, in October 1973, plaintiff was authorized to continue assessment work on his claims during the period from October 30, 1973 through October 30, 1974.

It is abundantly clear from the record that the Forest Service administrators of the SNRA have repeatedly and in good faith attempted to accommodate plaintiff's desire to develop his mining claims while at the same time fulfilling their mandate to protect the surface resources within the SNRA. Although plaintiff, in all likelihood, would prefer to be completely unencumbered by governmental regulation or administration, Congress has decreed that "[t]he Secretary shall administer [the SNRA] in accordance with the laws, rules and regulations applicable to the national forests in such a manner as will best provide [for] the management, utilization, and disposal of * * * mineral resources *insofar as their utilization will not substantially impair the purposes for which the recreation area is established.*" 16 U.S.C. § 460aa–1(a) (1982). Plaintiff has been restricted to some extent in his ability to develop and exploit his claims, but such restriction does not rise to the level of a compensable taking. In short, plaintiff has not been deprived of economically viable use of his property rights and the essential attributes of those rights have not been extinguished.

Plaintiff has failed to allege facts which would support a claim for taking by inverse condemnation. Accordingly, defendant's motion for summary judgment on Count III of the complaint will be granted, and the plaintiff's motion will be denied.

### IV. Plaintiff's Count II: Scenic Easement

Although Count II is not a model of clarity, it appears that the plaintiff is arguing that governmental regulation of his mining claims effected a taking of a scenic easement over those claims, *i.e.,* something less than the entire bundle of property rights contained in his five unpatented mining claims. In the alternative, plaintiff contends that the provisions of 16 U.S.C. § 460aa–2(a) (the scenic easement provision of the Sawtooth Act) *required* the Government to negotiate with plaintiff for the purchase of a scenic easement over plaintiff's claims. In plaintiff's view, the Government's failure to do so gave rise to a cause of action in this Court.

■ It is unnecessary to repeat a discussion of the effect of the Government's regulation and administration of plaintiff's

unpatented mining claims. It is sufficient to note that the United States has broad discretion to regulate mining operations conducted on federal lands. The regulatory scheme imposed by the Forest Service to control damage to the surface resources within the SNRA is one such example of the Government's exercise of its power to regulate uses of the federal domain. Significantly, the primary impediment to plaintiff's ability to develop his mining claims arose from his own uncooperativeness and unwillingness to furnish the Forest Service with information sufficient to permit an analysis of the potential for disruption of surface resources caused by plaintiff's proposed operations. Therefore, just as the plaintiff's Count III arguments failed to persuade this Court that there has been a compensable taking of plaintiff's entire property interest, the plaintiff's arguments in regard to Count II likewise fail to persuade the Court that the Forest Service's regulatory actions amounted to such a serious interference with plaintiff's use of his claims as to result in a taking of a scenic easement.

 With regard to plaintiff's assertion that the Government was obligated to negotiate with plaintiff for the purchase of a scenic easement, this Court has concluded that the provisions of 16 U.S.C. § 460aa–2(a) cannot be fairly interpreted to give rise to a cause of action in this Court. Section 460aa–2(a) provides:

> Except as provided in section 460aa–3 of this title, the Secretary is authorized to acquire by * * * purchase with donated or appropriated funds * * * any lands, or lesser interests therein, including mineral interests and scenic easements, which he determines are needed for the purposes of this subchapter.
>
> \* \* \* \* \* \*
>
> As used in this subchapter, the term "scenic easement" means the right to control the use of land in order to protect the esthetic values for the purposes of this subchapter * * *.

Plaintiff asserts that the foregoing provisions of the Sawtooth Act *obligates* the defendant to purchase a scenic easement over the plaintiff's mining claims. This contention is without merit.

 It is by now well established that the Tucker Act, 28 U.S.C. § 1491, is only a jurisdictional statute. The Act does not confer any substantive right to recover money damages from the United States. *See United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984); *Holmes v. United States*, 3 Cl.Ct. 521, 523 (1983). To invoke the jurisdiction of this Court, a plaintiff must base his claim upon substantive rights grounded in the Constitution, a contract, an act of Congress or a regulation of an executive department. *United States v. Connolly, supra*, 716 F.2d at 885. This Court's inquiry, however, is not whether the purported claim "intimately involve[s] the Constitution, an Act of Congress, or an executive regulation." *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1008 (1967). Rather, the proper focus is whether "any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan, supra*, 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport Steamship Corp. v. United States, supra*, 178 Ct.Cl. at 607, 372 F.2d at 1009).

 The accepted "starting point" for the interpretation of a statute is the statutory language itself. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537 (1982). Thorough examination of the provisions of 16 U.S.C. § 460aa–2(a), as well as the underlying legislative history, has not revealed any congressional intent to grant owners of property within the SNRA a substantive right of recovery against the United States arising from the Government's failure to purchase scenic easements over such properties. The plain language of section 460aa–2(a) indicates only an intention on the part of Congress

to grant the Secretary authority to acquire scenic easements within the SNRA when, in the exercise of his discretion, he deems it appropriate.

Examination of the legislative history of the Act reveals that the congressional intent underlying the Sawtooth Act was to ensure the preservation and protection of the lands within the SNRA. In this regard, the Secretary of Agriculture was vested with the authority to acquire, by condemnation if necessary, lands which he "finds are threatened with uses which will impair the natural, scenic, or recreational values" of the area. Conf.Rep. No. 1276, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 3013, 3046. The decision whether to acquire fee title, or a lesser interest such as a scenic easement, or whether to acquire any interest at all, is committed to the sole discretion of the Secretary of Agriculture. Accordingly, this Court determines that the provisions of section 460aa–2(a) of the Sawtooth Act cannot fairly be interpreted as "mandating compensation by the Federal Government for the damage sustained." *Eastport Steamship Co. v. United States, supra,* 178 Ct.Cl. at 607, 372 F.2d at 1009. Plaintiff at no time had a right to compel the Government to purchase a scenic easement over his mining claims.

In view of the above discussion, the defendant's motion for summary judgment with regard to Count II of the complaint will also be granted and the plaintiff's cross-motion will be denied.

In the final analysis, and after a thorough review of this voluminous file, this Court concludes that the Forest Service's actions in regulating the plaintiff's five unpatented mining claims contained within the SNRA in no way rose to the level of a compensable taking. The Government's actions were taken in good faith, were reasonable and were necessary to carry out the mandate of the Sawtooth Act. The actions taken by the Forest Service did not cross the line into overbroad regulation that could amount to a compensable taking of either the unpatented mining claims

themselves or a scenic easement thereof. Likewise, the Government was not required by the Sawtooth Act to negotiate with the plaintiff for a condemnation award of his mining claims.

### CONCLUSION

Based on the foregoing, defendant's motion for summary judgment on Counts II and III is granted. Plaintiff's cross-motion for summary judgment is denied. The complaint will be dismissed.