**Alex J. ARMIJO et al.**

v.

**The UNITED STATES.**

**No. 94–79L.**

United States Court of Claims.

Oct. 21, 1981.

---

J. Douglas Foster, Roswell, N. M., for plaintiffs. Harold L. Hensley, Jr., Roswell, N. M., attorney of record, for plaintiff grazing lessees. Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, N. M., of counsel.

William O. Jordan, Santa Fe, N. M., attorney of record for Com'r of Public Lands, State of N. M.

Gerald S. Fish, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Karlissa B. Krombein, Army Corps of Engineers, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and KASHIWA, Judges.

NICHOLS, Judge:

The claims here are to recover "just compensation" for takings contrary to the fifth amendment, a time-honored branch of our jurisprudence which has included claims founded on the Constitution since the Tucker Act of 1887, now 28 U.S.C. § 1491. The claims present, if valid, another illustration of the variety of possible ways in which the sovereign can entangle itself in monetary liability in taking cases. The case is before us on cross-motions for summary judgment, and we hold that as to the taking date and quantum, the relevant facts have not been stipulated or determined, otherwise, there is no contested issue of relevant fact, but judgment for plaintiffs would be premature as no taking date is as yet established.

I

The plaintiffs are the State of New Mexico, and lessees of grazing land which is, or was, state-owned. These lessees have been recognized by the United States Government as having a property interest in their lands. It has paid them rentals which they, in turn, have in part paid to New Mexico. In 1942, now almost 40 years ago, defendant established the White Sands Missile Range, has maintained it ever since, and the record reflects no expectation it will cease to do so in the next forty. The Range is a permanent facility. The property involved is within the Range. This use by defendant is entirely preclusive of any use for grazing, and no such use is permitted. Defendant has withdrawn from entry all United States-owned public land within the Range. It has acquired by purchase or condemnation in fee simple as of on or about 1975, all privately-owned land therein, land which is interspersed with the plaintiffs' land in checkerboard fashion, and is physically not distinguishable. How defendant compensated plaintiffs up to 1946 does not appear. Beginning then, funds to pay them for their leases were available and apparently satisfactory bilateral agreements were made until 1970. The Department of Defense, which operates the Range, wished to acquire the plaintiffs' land also, in fee, but Congress balked in funding such acquisitions because it believed that leasing was cheaper, and that the lands could be acquired more cheaply yet after the water table had fallen, as it was doing and was expected to continue doing. Therefore, in 1970 defendant condemned, where it could

not purchase, leaseholds on a year-to-year basis with options to renew to 1980. In that year it filed a similar suit to obtain corresponding rights through 1990. This proceeding was then pending. The plaintiffs originally petitioned here on the theory that the 1975 condemnation of the privately-owned lands in fee simple effectively took the state-owned land also, because of the realities of the cattle business. We assume this means that the land was not fenced and cattle on the state land not taken could have wandered into the private land the government had taken. However, it seems to be agreed that no cattle raising anywhere within the White Sands Missile Range has been possible since 1942.

 The issue, very simply, is whether the assessment of rentals on and after 1970 from year to year through 1990, at fair rental values, satisfies the fifth amendment just compensation rights of the state and its lessees. For purposes of the instant case, we can assume, as in *Peerless Coal Co. v. United States*, 215 Ct.Cl. 1045 (1978), that U. S. District Courts will refuse on jurisdictional grounds to take any responsibility if defendant's description of the interests it has chosen to take under the condemnation statutes, 40 U.S.C. §§ 257, 258a, fails to describe entirely or accurately the interests taken and thereby attempts to deny a portion of the just compensation to which the landowner is entitled. *United States v. Winnebago Tribe of Nebraska*, 542 F.2d 1002, 1007 (9th Cir. 1976); *United States v. 101.88 Acres of Land*, 616 F.2d 762, 767 (5th Cir. 1980); *United States v. 40.60 Acres of Land*, 483 F.2d 927, 938 (9th Cir. 1973). As stated in *United States v. 1440.35 Acres of Land*, 438 F.Supp. 1070, 1074 (D.Md.1977), the Court of Claims under § 1491 is more or less the clean-up man to take care of this as all other instances where Congress has taken property and inadvertently, or purposely, failed to provide just compensation anywhere along the line. *Moore v. Regan*, —— U.S. ——, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 125–36, 95 S.Ct. 335, 349–355, 42 L.Ed.2d 320 (1974); *Malone v. Bowdoin*, 369 U.S. 643, 647 n.8, 82 S.Ct. 980, 983 n.8, 8 L.Ed.2d 168 (1962). If defendant's use of the statutory jurisdiction under 40 U.S.C. §§ 257, 258a fails to award just compensation in face of the device defendant has now thought up, the remedy is here.

## II

 We think that the system of temporary takings of one year leases fails to provide just compensation when a taking of a greater interest has in fact occurred. There are two well recognized situations where the government will be held to take without any formal expropriation or physical invasion. One is the actual cutting off of access. *Laney v. United States*, Ct.Cl. No. 130–80L (slip opinion of August 19, 1981); *Foster v. United States*, 221 Ct.Cl. 412, 607 F.2d 943 (1979); *Drakes Bay Land Co. v. United States*, 191 Ct.Cl. 389, 424 F.2d 574 (1970); *Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976). The other is when the government regulation is practically so burdensome and pervasive that the landowner is denied all use of his land. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Benenson v. United States*, 212 Ct.Cl. 375, 548 F.2d 939 (1977). In such cases the characteristic feature is the defendant's use of rightful property, contract, or regulatory rights to control and prevent exercise of ownership rights the defendant is unwilling to purchase and pay for. It seems clear that the carving out and separating of present and future interests can and does have the same effect. The landowner cannot plan the future use of his land, or sell to others who have a future use in mind, because both know the project, the White Sands Missile Range, will still be there. It is stipulated that there is no prospect of its going away in the foreseeable future, and this, for eminent domain purposes, is the same as perpetuity. *Kabua Kabua v. United States*, 212 Ct.Cl. 160, 546 F.2d 381 (1976), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977); *Foster v. United States*, 221 Ct.Cl. 412, 607 F.2d 943 (1979). Where a leasehold interest is taken to serve a purpose that is or may be temporary, the case is, after all, very different.

Both sides claim to derive comfort from *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Then the United States by declaration of taking carved a leasehold out of a leasehold. The condemnee was kept holding a short remaining portion of its leasehold. In these peculiar circumstances, a majority of the court held that moving expenses should be allowable contrary to the normal rule, not in their own right, but as included in the measurement of the fair value of the peculiar interest taken. Defendant hardly can derive much comfort from the passage at 383, 65 S.Ct. at 362, wherein the Court in a hypothetical imagines with horror precisely what defendant has done here, *i. e.*, carve out a short rental term with optional contingent renewals. It is true there is nothing in the opinion to say the scope of the taking is greater than that described in the declaration. The flexibility is all in the just compensation. The Court of that day would certainly not have blanched at, say, a first single year's rental award as large or almost as large as 10 years' ordinary rental, if that were needed to make the condemnee whole. It is clear, however, in this case, that the district and circuit courts insistence on treating complaints about the scope of the taking as unallowable counterclaims, plays into defendant's hands. Defendant is shown in the congressional testimony cited by defendant in its brief as expecting to obtain rentals so low that over many years their capitalized values would not equal a probable single award for the entire fair market value. Defendant is playing as it does, not only to avoid having to ask for capital funds, but also because it sees an actual overall monetary saving.

██ We are not, of course, opposed to defendant saving money, but here it is doing it at the expense of the landowners' constitutional rights. They are entitled to just compensation in money, and to interest as delay damages to the extent they do not get their entire award contemporaneous with the taking. Thus money means a unitary award. *See Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934); *De Luca v. United States*, 84

Ct.Cl. 217, 245 (1936). It was never held that condemnees could be required to take their awards in property or bonds. Here, the landowner is by the existence of the Missile Range itself, virtually in the position of being deprived of the entire fee. He has nothing he can sell, nothing he can use. Yet he gets his award not at once, but dribbled out over decades. This is not what the fifth amendment requires.

██ Defendant says it is entitled to decide on the interest to be taken, and of course it is. The selection of a temporary interest for condemnation would not be challengeable if the taking was intended to be temporary, whether for a fixed or uncertain period. Defendant cannot, however, state a taking that is permanent for all purposes except assessment of just compensation, and temporary as to that alone. That is the effect of what it does here. The landowner is not put in as good a position as if the property were not taken, so far as money can do it. He could, with a unitary award, invest it in similar property and deal with that as the owner. Here he cannot. He cannot use or sell his expectation of receiving future rental as he could the property itself. One whose property is in the possession of a lessee who has power to extend the lease at will, is not in the position he occupied before the lessee entered into possession.

The date of the taking is not so easy and of course if it occurred over 6 years before March 12, 1979, the date plaintiffs first sued, the suit is barred by virtue of our 6-year statute of limitations, 28 U.S.C. § 2501. *Kabua Kabua v. United States, supra.* Plaintiffs' theory that the taking date conforms to the taking date of the privately-owned land, 1975, is valid only if the taking did not occur earlier. The facts as the parties present them reflect, at least by implication, that defendant's possession and use of the state lands up to 1970 was by consent and not adverse. If this is so, the choice of a taking date from 1970 to March 12, 1973, is all plaintiffs have to fear. The parties have not briefed the taking date

except on the 1975 theory which we deem as stated not to be adequate, if the taking was earlier. Whether changes occurred from time to time in the nature of the government use we do not know. It may be that plaintiffs were not made to realize as early as 1970 that the rentals were not just a temporary expedient until funds for fee procurement could be obtained, as we know the Department of Defense wished to do. At any rate, the government's 1975 decision to condemn the fee in the private lands, but not the state lands, was a more striking and dramatic announcement of defendant's position than had occurred earlier. We leave the choice of a taking date for future proceedings, holding now that defendant has taken the entire fee of the state lands and must pay unless it can show it took before March 12, 1973. Its theory up to now has been it has taken no more than is described in its declarations of taking, *i. e.*, temporary leaseholds and options. This theory we reject.

### III

■ If, however, the taking is unauthorized, the acts of defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner. *Southern California Financial Corp. v. United States*, Ct.Cl., 634 F.2d 521 (1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981); *NBH Land Co.. v. United States*, 217 Ct.Cl. 41, 576 F.2d 317 (1978). It is, however, important to consider what authority consists of in this context. It is clear that the Congress intended to withhold funding of fee acquisitions of state-owned lands for White Sands, and limit expenditures for payment to landowners to rentals, either agreed upon or fixed by the condemnation court. It knew full well that the Department of Defense was putting this latter device to wide use to avoid paying for the fee in taking cases. If by withholding the funding Congress meant to withhold authority to take, the lack of authority defense is valid and must prevail. But in *Drakes Bay, supra,* the doings held

to be takings were engaged in precisely because appropriated funds were unavailable to acquire the land. Congress had included the plaintiff's land within the exterior boundaries of a national park, but had plainly indicated that actual taking of title was to wait, unless a landowner made a donation or accepted an exchange of government land outside the park, or could be paid in money out of funds dribbled out year by year, with no expectation of the early years appropriations being enough for all the land. The Supreme Court's analysis in the *Regional Rail Reorganization* cases, *supra,* confirms ours in *Drakes Bay.* In authorizing activities that may or may not infringe on property rights yet in making no provision for payment if they do, Congress must be deemed to hope that it will not infringe, but to intend that if it does, the Tucker Act and the standing appropriation to pay Court of Claims judgments, will be the safety net that will save any violation of the fifth amendment from occurring and by the same token will save the project from being stymied by court injunctions. *Hurley v. Kincaid*, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932). *See also* our reasoning in *Eyherabide v. United States*, 170 Ct.Cl. 598, 607, 345 F.2d 565, 570 (1965).

■ Defendant urges a presence of authority to take leasehold interests, but an absence of authority to take the fee. Defendant urges that in the Military Construction Authorization Act of 1971, Pub. L.No. 91–511, § 104, 84 Stat. 1204 (1970), the Congress authorized acquisition of state-owned land at market value for White Sands, but never appropriated funds to implement this authority, and repealed it in Pub.L.No. 92–145, 85 Stat. 410 (1971). In effect, we think Congress intended to authorize or ratify the taking of the fee for all intents but one, the assessment of just compensation, and as to that one, it intended to require assessment of just compensation on a rental basis only. The legislative actions summarized by defendant can lead to no other conclusion, and the fifth amendment being thus unescapably implicated, the only issue remaining is whether the remedy is by

assessment of just compensation, which is for us, or by injunctive or declaratory relief, which is for other courts. If the *Regional Rail* and *Drakes Bay* analyses apply, it is the former. This is a case where the Tucker Act safety net comes into use.

 Another statute, 10 U.S.C. § 2662 says the Secretary of any military department may not enter a transaction for the acquisition of fee title to any real property at an estimated price of more than $50,000 until 30 days after he has reported the facts concerning the proposed acquisition to the Armed Services Committee of the Senate and House of Representatives. This was changed by Pub.L.No. 86–500, enacted June 8, 1960, from a previous requirement for "agreement" by the concerned Committees. U.S.Code Cong. & Admin.News, 86th Cong. 2d Sess. (1960) 2245, 2333. The purpose was to avoid a conflict with the executive branch, which was complaining of an unconstitutional exercise by Congress of an executive function. It seems obvious that whatever the case may have been before 1960, the provision since then cannot apply to "inverse condemnations" by the defense departments. It would be impossible to comply with because, to put it bluntly, the Service Secretary cannot give notice 30 days before a proposed transaction since he does not intend any transaction until he has read the court judgment telling him he has entered into one. That there have been numerous "inverse condemnations" since 1960, involving over $50,000, hardly requires documentation. Recent instances are *Branning v. United States*, Ct.Cl., 654 F.2d 88 (1981); *Foster v. United States, supra.* Congress cannot but have known of the "inverse condemnation" cases. It is reasonable to suppose that Congress did not intend by § 2662 to disauthorize any activities of the United States that might effect an "inverse condemnation" at a cost over $50,-000, if otherwise authorized. The rational alternative, and the one we adopt, is that § 2662 in its present form does not have any impact, one way or the other, on the authority of federal agents to take actions that might be held to effect "inverse condemnations."

The question of what constitutes lack of authority in federal officers to effect an inverse condemnation came up in *NBH Land Co. v. United States, supra.* There military officers attached to a military post, favored proposals to enlarge it by annexation of private land. Pending necessary congressional action, they took various measures to inhibit private development of the intended annexation area. Congress, however, expressly refused to authorize the annexation, and the project died. Some landowners in the area then sued to recover for a taking they alleged had occurred as the result of the officer's actions. We held it would be an inadmissible blow at the congressional power of the purse to fasten liability on the government to pay for land the Congress had expressly rejected.

We cited *Hooe v. United States*, 218 U.S. 322, 335, 31 S.Ct. 85, 89, 54 L.Ed. 1055 (1910). The portion thus cited deals with a basement occupied by federal officers under no visible authority. The upper floors were held under a lease with rental appropriated by an act which expressly limited the rentals for that building, which limit was exhausted in the rent of those upper floors. The portion of the decision we cited holds that fifth amendment liability for the basement could not be founded on the acts of officers wholly without authority from Congress, express or implied, the implication being to the contrary in view of the express rental limit, depleted in paying for the upper floors.

This court's decision in *Southern California Financial Corp., supra*, deals with a situation similar in many ways, but it also embodies differences that preclude its governing this case as a precedent. The same device was used, as here, that is, the condemnation of annual options to lease, thus avoiding the necessity of committing a sum over $50,000 at one time, though the intended governmental use, if not permanent, at least had no definite termination date, and under the authority cited above was near enough to permanent to be so for eminent domain purposes. One major difference,

however, is the trial judge's finding of fact No. 35(a), as set forth in n. 3 of our opinion. The key part of this is the first sentence—

Air Force acquisitions of interests in land with a value in excess of $50,000 must be approved under the annual Military Construction Authorization Act. * * [634 F.2d at 523.]

This was taken by the panel to mean that Congress itself had imposed such a limitation. Certainly the writer of this opinion, the only judge a member of that panel and also of this one, so supposed. The existence of such a limitation brought the case close to the *Hooe, supra,* facts and well within our recent *NBH Land Co., supra,* precedent. In effect, it repealed *pro tanto* the Tucker Act safety net. It was somewhat odd to use a finding of fact to cite a statute in that fashion, and perhaps something else was intended, perhaps only an informal committee practice or unwritten law. At any rate, what we all needed, no doubt, was the unindoctrinated small boy of the Emperor Has No Clothes fable. What is the citation of the supposed statute? After the able assistance of counsel in the present case, we know of none. We hesitate to say there exists none, but at least find as a fact there is none cited to us applicable here. The finding in question in the *Southern California* case was not only unchallenged in this court, but examination of the petition for certiorari the loser filed and defendant's response shows it was not challenged in the Supreme Court. But it does not carry over into another case with different plaintiffs.

On the other hand, there was nothing to show in that case, that the use or misuse of condemnation of one year rental options was known to Congress. If an abuse, it could have been one concocted by the military at the local level, not binding if it infringed the fifth amendment, but correctable, if wrong, by other means than "just compensation." In this case it is clear by defendant's submission that the practice is well known to Congress, and must be deemed as fully authorized as if the Congress had expressly directed the assessment of compensation for a permanent taking in one year rental installments.

Another difference in the cases is as follows: here the taking is completely independent of the condemnation of one-year lease options, and would have occurred just the same had there been no condemnations. In the *Southern California* case, however the defendant allowed agricultural use and access for that purpose to continue. It undertook to prevent only a then nonexistent use, *i. e.,* for residential occupancy. This use would have been dangerous in view of the proximity of defendant's ammunition dump, but in any case would have been premature. Actual immediate development would have been uneconomic in that remote area as long as possible residential sites closer to the centers of population remained undeveloped. The only interest acquired by defendant in its condemnations was the right to prevent a development that was not imminent anyway. In such circumstances, it is by no means plain and obvious that the provision of rent in annual installments was an inadequate means of assessing just compensation, since it seems clear that the mere proximity of the ammunition dump was not, in and of itself, a taking. We may note that frustration of the highest and best use, even when that use is imminent, is not necessarily a taking. *Deltona v. United States,* Ct.Cl., 657 F.2d 1184 (1981).

## IV

In view of the foregoing, summary judgment for plaintiffs is premature and it is denied. Defendant's motion for summary judgment is also denied and the cause is remanded to the trial division for further proceedings.

FRIEDMAN, Chief Judge, concurring in the result.

Although I agree with the court that the motions for summary judgment should be denied, I write separately because I view certain aspects of the case somewhat differently than it does, and would not say many of the things it says.

1. The apparent rationale of the court's decision, with which I agree, is that the taking was the preclusion of the beneficial use of the property by the plaintiffs as the result of the inclusion of the property in the White Sands Missile Range and not the condemnation of the 10-year term of annual leaseholds.

I also agree with the court that, under this theory, the date of taking—on which, by definition, the statute of limitations in this taking case began to run—cannot be determined on summary judgment but requires further development of the facts. The White Sands Missile Range was established in 1942, and the taking may have occurred at that time, shortly thereafter, or not until much later. Until all the pertinent facts concerning the operation of the Range and the point at which its activities had a sufficient impact upon the use of the land to constitute a taking of the plaintiffs' interest are known, however, it is impossible to determine whether this suit was timely filed. Since the petition was not filed until March 12, 1979, the suit cannot be maintained unless the taking occurred after March 12, 1973.

Finally, I agree with the court that the amount awarded as just compensation for the yearly leasehold interests the United States acquired by condemnation do not constitute just compensation for the government's taking of the plaintiffs' interest in the land that occurred. The amount awarded for the temporary takings by definition is only the value of those ephemeral interests, which also by definition does not equal the value of the permanent property interests taken from the plaintiffs.

2. In *Southern California Financial Corporation*, the trial judge ruled that a similar series of condemnations of yearly leasehold interests by the Air Force constituted a taking as of the date "the plaintiff knows or has reason to know both that his land has been taken and the extent of the taking," and that such taking occurred when the attorney for the United States stated during a conference in judicial chambers that the government "would continue to condemn the property in the future ad infinitum." The trial judge concluded that "successive condemnations of terms for years, coupled with a permanent need for the property and a fixed determination to continue condemnations indefinitely for the foreseeable future, amount to a taking of the fee or a permanent easement." We rejected that conclusion without reaching the merits, on the ground that the Air Force had no authority to take a fee or perpetual interest worth more than $50,000, and therefore dismissed the petition.

(a) In the present case, unlike *Southern California*, the taking the court finds was not the series of leaseholds condemned, but the prior establishment of the Range, which at some point made the plaintiffs' interests in the property worthless for grazing purposes. The *Southern California* case accordingly does not stand in the way of the court's determination that there was here a taking for which the plaintiffs are entitled to just compensation.

(b) In dismissing the petition in *Southern California*, we held, on the basis of the trial judge's findings which we accepted, that "a taking of the permanent or indefinite character now claimed by plaintiff would have required the specific consent of Congress under the annual Military Construction Program" and that "in seeking renewable one-year leases, the Air Force deliberately sought to avoid the need for approval in an annual Military Construction Appropriations Act, and no such consent was obtained." At 523–24, footnotes omitted. In seeking review of the trial judge's decision, neither party challenged or even questioned those findings, and we acted on the assumption that the cited statutes required prior congressional approval.

In the present case, however, we know that although prior to 1960 the statute imposed that requirement, the statute was changed in that year to require only that the Secretary of any military department give the Armed Services Committees of the Senate and the House 30 days' prior notice before acquiring the fee title to real property for more than $50,000. The *Southern*

*California* decision holds only that, under the earlier statute we assumed was applicable, the Air Force had no authority to take a fee interest. That decision does not govern the present case, in which the current statute does not impose that requirement.

Of course, if it were held that the taking in this case occurred prior to 1960, the earlier statute would then be applicable and *Southern California* would bar the present suit. But if the taking occurred at that earlier time, there would be no need to consider this issue, since any suit based upon such earlier taking would long since have been barred by our 6-year statute of limitations.