**OSPREY PACIFIC CORP., an Oregon Corporation, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 93–710.

United States Court of Federal Claims.

June 10, 1998.

Gregory W. Byrne, Portland, Oregon, for plaintiff.

John S. Groat, Washington, D.C., with whom was Jeanne E. Davidson, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, for defendant. David L. Frecker, General Services Administration, was of counsel.

## OPINION

SMITH, Chief Judge.

This case involves a claim for damages resulting from the seizure of a Navy patrol boat (PTF–26) that had been declared surplus and donated to an Oregon public agency under the Federal Property Administrative Services Act of 1949, 40 U.S.C. § 484 (FPA-SA).

This is an unusual case. Its fact pattern does not fit the regular takings mold. At issue here is not a forfeiture, but a physical seizure, based upon an unfounded belief that the federal government had a valid claim to a boat that had been surplused. Unlike either an *in rem* or an *in personam* forfeiture where the law penalizes certain types of conduct in connection with certain types of phys-

ical or intangible property, the beginning of this case was a dispute over ownership of a leasehold.[1] The government seemingly believed it had a legal right to get the property back. While it appeared to have abandoned that view soon after the seizure, it has never accepted the legal consequences of its action. The court must grant the plaintiff the relief he seeks since the government's claim was unfounded, though, the court notes that it is still far from clear why the government felt it could or should take the subject boat. For purposes of this opinion, however, all that is important is that the federal government, acting purposefully within its statutory authority, took the property and effectively rendered it valueless.

Initially, the court held oral argument on cross motions for summary judgment and the government's motion to dismiss. The government's motions were denied and the court held a trial in Portland, Oregon. Plaintiff's complaint and motion for summary judgment rested on three alternative theories: First, plaintiff argued that the government breached a valid contract between the parties by seizing PTF–26. Second, plaintiff contended that if the court found that there was no valid contract between the parties, then the seizure would constitute a taking of its leasehold interest in the vessel that arose from a valid contract between plaintiff and the Port of Newport. Finally, plaintiff argued that even if the court found that it had no valid interest in PTF–26, it would still be entitled

to reimbursement of its investment in the vessel.

After oral argument, trial, and consideration of the briefs and relevant law, the court GRANTS plaintiff's motion for summary judgment on its alternative theory that the seizure of PTF–26 was in violation of plaintiff's Fifth Amendment rights and finds that the-government is liable to plaintiff for just compensation for the physical taking of PTF–26.[2] On the basis of the trial, the court finds that just compensation entitles plaintiff to an award of $550,000 plus compound interest from the date of the taking and awardable costs and attorneys fees.

## FACTS

On April 24, 1985, the Port of Newport requisitioned a surplus Navy PT boat from the state of Oregon under the FPASA[3] in an attempt to procure it for use as a set for a movie that was to be filmed by a group headed by actor Robert Culp. This request was forwarded to the General Services Administration (GSA) which, after approval, transferred to Oregon a 95–foot patrol torpedo boat, designated PTF–26, on July 15, 1985. On July 24, 1985, Oregon and Newport executed a Vessel Conditional Transfer Document (1985 VCTD), which imposed a number of restrictions on the latter's use of PTF–26. The 1985 VCTD provided that PTF–26 would be placed into use as a movie set within 12 months after acquisition and would be used for a 12-month period thereaf-

1. Throughout this opinion, the court refers to the leasehold as the 'boat'.

2. The plaintiff's contract theory may provide a basis for relief, but because of the complex legal issues it raises, the court found that the takings claim better described the circumstances and their legal consequences. In considering the contract theory, the court reviewed the government's arguments regarding the sovereign acts doctrine and found that they had no relevance to this case.

3. The FPASA provides for the disposal of surplus federal property through a number of different means. 40 U.S.C. § 484(j) controls the disposal of property by transfer to State agencies for donation within the State

> to any public agency for use in carrying out or promoting for the residents of a given political area one or more public purposes, such as

conservation, economic development, education, parks and recreation, public health, and public safety;

40 U.S.C. § 484(j)(3)(A)(1986 & Supp.1998).

States wishing to receive surplus property for the purposes of donation within the state must meet a number of requirements. Any such state must develop a "detailed plan of operation" for the distribution of the property in order to ensure that any donee of the surplus property uses it in compliance with the FPASA. This plan must include, among other things, provisions for the fair and equal distribution of the property, the establishment of a management control system, and the utilization of an effective accounting system. 40 U.S.C. § 484(j)(4). In addition, the FPASA requires that the property be placed in use for its declared "intended purpose" within one year of the donation and that such use continues for one year. 40 U.S.C. § 484(j)(4)(C)(ii).

ter. In addition, use of the boat was restricted to the purposes stated for another 48 month period to begin upon the completion of the first 12-month period. Substantial repairs were made to PTF–26 in preparation for its use as a movie set. While these repairs were being made by Modoc Technical Services, Inc. (Modoc) of Klamath Falls, Oregon, the film project was terminated, leaving an unpaid repair bill of $129,288.

On May 8, 1986, the United States Navy requested the use of PTF–26 as a patrol boat at its Pacific Missile Test Center. In response to this request, Newport issued a Request for Proposals (RFP) in an attempt to locate a private party willing to charter the boat and operate it for the Navy. On November 3, 1986, a company called Greater Pacific Associates submitted a proposal to charter PTF–26 and entered into a contract with the Navy. Upon Newport's acceptance of this proposal, Greater Pacific formed a new corporation to undertake the charter, naming it Osprey Pacific Corporation (Osprey), the plaintiff in the instant case.

Newport and Osprey proceeded to negotiate a Preferential Use Agreement (Charter), under which Newport chartered PTF–26 to Osprey for five years, with an option for an additional five years. In return, Osprey agreed to reimburse Newport $44,664.31 for expenses incurred in transporting and caring for the vessel, to satisfy Modoc's $129,288 lien, and to pay Newport an annual "user's fee" determined as the greater of $5,000 or 5 to 10 percent of the gross receipts depending upon the amount. This agreement was executed on January 5, 1987, and was to take effect only upon the satisfaction of certain contingencies, including Osprey's execution of a contract with the Navy and "approval of the agreement and its terms by the State of Oregon, acting for and on behalf of the United States Government." *See* Pl. Mem. at 10–11.

During the negotiation of the Charter, Oregon's Manager of Surplus Property submitted a draft of the Agreement both to Oregon's Department of Justice and to GSA. In a memorandum dated December 23, 1986, a GSA counsel opined to the Director of GSA's Property Management Division that the Charter was "legally insufficient" because a clear "public purpose" was not specified. Newport and Osprey responded by drafting a "Statement of Public Purpose Supplement," in which, according to plaintiff, they "described in detail" the economic and educational benefits that would be provided by the Charter. The Charter and this supplement were approved by Oregon on July 10, 1987. Meanwhile, on or about June 19, 1987, Oregon executed a Vessel Conditional Transfer Document (1987 VCTD) to transfer possession of PTF–26 to Newport with the condition that the latter would use the vessel according to the Statement of Public Purpose Supplement—i.e. the performance of the Navy contract.

On July 13, 1987, Oregon forwarded a copy of the signed Charter and supplement to GSA, along with a request for GSA's "expeditious review and approval" of the plan. No response was made to this letter by GSA, and the government contends that no GSA approval was ever given. Plaintiff, on the other hand, claims that there is no evidence that GSA ever objected to these documents. In addition, plaintiff points to the finalization of the Charter on August 18, 1987. This finalization involved the signing by Newport, Osprey, and Oregon of an amendment which recited that all of the aforementioned contingencies, including Oregon's approval on behalf of the United States, "are now satisfied."

Newport, Osprey, and the Navy proceeded with the transactions. The Navy issued a "Confirming Order" to Osprey and Newport on June 23, 1987, directing them to furnish a completely equipped vessel in a fully operational status for 30 days commencing August 7, 1987. Osprey completed the renovation of PTF–26 and commenced operations for the Navy in October 1987, continuing them for the next three years.

On December 22, 1989, the Assistant General Counsel, Personal Property Division, GSA, wrote a memorandum ordering the review of the donation of PTF–26 to Newport and concluding that Newport had failed to meet the "public purpose" requirements of the Federal Property Management Regulations. GSA notified Oregon's Department of General Services on February 16, 1990 and

opened a non-compliance case against Newport and Oregon on March 5, 1990. On June 7, 1990, Oregon submitted to GSA a Second Amendment to the Charter, which had been signed by Osprey and Newport. A third amendment was executed on July 1, 1990. Plaintiff claims that GSA never responded to these amendments but instead ordered Oregon to seize PTF–26 and to return it to GSA. GSA directed the State of Oregon's agency for surplus property to seize the boat on September 28, 1990. This seizure of the boat and equipment took place on October 3, 1990. The Navy, however, apparently lacked the capability of crewing or maintaining the vessel. Therefore, on March 19, 1991, GSA approved the release of all restrictions on the transfer of PTF–26 to Oregon. Osprey was out of business by this time, though, and Newport declined to take back the vessel. GSA finally donated PTF–26 to the Boys & Girls Club of South San Francisco on July 16, 1992.

Plaintiff submitted claims to the relevant contracting officers under the Contract Disputes Act in 1993. Later that year, plaintiff filed its complaint before this court. Plaintiff then filed its motion for summary judgment and the government responded with a motion to dismiss and a cross-motion for summary judgment. After oral argument, the court denied both of the government's motions from the bench and took plaintiff's motion for summary judgment under advisement. In order to further the possibilities for settlement, and pursuant to the parties' request, the court then issued an unpublished memorandum opinion explaining the court's "first impressions" following the oral argument. Since the parties were unable to agree to a settlement, the court held a trial in Portland. Following trial, the court advised the parties as to its preliminary decision on liability and damages; however, settlement still was not attained and the court now issues this opinion.

## DISCUSSION

■ In a takings case "the court must initially decide if the plaintiff has an actual property interest". *Hage v. U.S.*, 35 Fed.Cl. 147, 151 (1996). After this initial inquiry, if the court decides that the plaintiff does have a property right, the court must next determine whether the governmental action at issue constitutes a taking under the Fifth Amendment and its case law. *Id.* If the court finds there has been a taking, the court must then determine just compensation.

## I. THE PROPERTY INTEREST

■ The dispositive question in this case is whether or not plaintiff had a valid right to possess PTF–26. Plaintiff argues that based on its contract with Newport and Oregon (through the Charter), it had a valid leasehold interest in PTF–26. This is supported by the Charter Agreement between Newport and Osprey and its amendment, the VCTDs transferring possession from Oregon to Newport, and the Navy's "Confirming Order".

The government responds that plaintiff never had a valid property interest in PTF–26. It argues that the United States owned the boat and that they never authorized the use of it by plaintiff. Their rationale is that GSA never approved the 1987 VCTD and, thus, the agreement was unlawful and the United States cannot be bound by it. Plaintiff, however, is relying on a contract between itself and a third party (Newport), rather than on a contract with the federal government itself. As plaintiff explains in its brief, its takings claim assumes that there was no valid contract with the United States, but that there was one with Newport (or with Newport and the State of Oregon) through the Charter.

The government notes that 40 U.S.C. § 484 provides for the donation of property to public agencies for use in promoting one or more public purposes, one of which is economic development. It argues that the statute did not give Newport the authority to transfer property (including by lease) to a private corporation which in itself would not be eligible to receive donations of surplus property. This argument is unavailing. Not only, as plaintiff argues, does the government fail to cite any authority for this interpretation of the FPASA, but this interpretation is inconsistent with the one the government apparently had in 1985 "when it donated PTF–26 to [Newport] for use by a private

company to make a Hollywood movie." Pl. Mem. of Supp. Auth. at 6. Moreover, as plaintiff notes, public agencies frequently lease donated property to private companies. In fact, much of the government's activity is carried out by contracting with private parties, many times using government property or materials. The government's latest interpretation of the FPASA would render any and all such arrangements unlawful. Unless a donor places restrictions on the use of donated property before it is transferred, that donor loses control over the recipient's use of the property—including the leasing or selling of that property to a third party.

In the instant case, even assuming the public purpose requirement did bar plaintiff's use, the restriction on the use of PTF–26 expired after the first year it was used as a movie set. See 40 U.S.C. § 484(j)(4)(C)(ii). After this expiration, there were apparently no federal restrictions preventing Newport from leasing the vessel to plaintiff. Any other restrictions on Newport's use of the vessel originated with Oregon, which lifted them when it approved the Charter. The 1985 VCTD provided that "[t]he property shall be placed in use for the purpose stated above no later than 12 months after acquisition thereof and used for a 12 month period thereafter." The "purposes stated above" referred to prior provisions in the same document and a "Letter of Intent" dated 4/24/85 from the Port of Newport to the local GSA official requesting the PTF–26. The 1985 VCTD stated:

> [T]he [PTF–26] is required in the furtherance of the Donee's program and [ ] such property will be used solely in connection with such programs and more specifically for all the following purposes: To serve as a working platform for various maintenance operations as required in and around the Harbor [.] In accordance with the proposed program and plan as set forth in the Donee's [Port of Newport's] "Letter of Intent" dated April 24, 1985, which expression of interest is hereby incorporated herein and made a part hereof, and for no other purpose....

Thus, the relevant "purposes" were defined principally by the following paragraph in the "Letter of Intent":

> The initial purpose for which the vessel will be used will include its being operated by the Port vessel operations section as the primary set for a pilot film being planned for this location. Subsequently, the vessel will be utilized for high sea rescue/backup and for other harbor service needs, including its availability for use as a pilot boat, to deliver our harbor pilots to awaiting cargo vessels transiting the Yaquina Bay bar. Naturally, as a public entity, we have a continuing relationship with local and regional law enforcement, and the vessel will become available for that application as well.

Thus, the contemplated purposes for which the PTF–26 might become used were clearly not confined to use only as a movie set, nor were they necessarily confined to use by the Port of Newport. The foregoing restrictions were the only limitations on the Port of Newport's disposition of the property apart from the public purposes requirement of the FPASA. Such restrictions were, according to the 1985 VCTD, to remain in force for 12 months after the PTF–26 entered service as a movie set, plus an additional 48 months. The 1985 VCTD was concluded on July 24, 1985. The PTF–26 was then used, first as a movie set, then pursuant to the Charter between Osprey and the Port of Newport to serve the Navy's purposes as a patrol boat up until the GSA seized the vessel on October 3, 1990. Thus, it appears that at no time was the PTF–26 used inconsistently with either the public purposes requirement of the FPASA or the restrictions placed upon it by the 1985 VCTD. The government has never made it clear why use as a patrol boat operated by a private company for the benefit of the Navy is a violation of the contemplated uses or the FPASA' public purpose requirement. In addition, any restrictions imposed upon the use of the PTF–26 would have expired as of July 24, 1990.

Further, the government at the summary judgment stage did not dispute plaintiff's contention that paragraph 13 of the 1985 VCTD allowed the United States, acting

through the State of Oregon, to "waive any or [ ] terminate all of the terms and conditions set forth" in the preceding paragraphs of the agreement that included the 48 month restriction. Oregon's approval of the Charter to Osprey was thus entirely consistent with the 1985 VCTD, and Osprey's use of PTF–26 was lawful thereunder. Therefore, Newport's leasing of the vessel to plaintiff was valid and consequently, the leasehold interest was also valid. The court finds that plaintiff had a valid and compensable property interest in the vessel when it was seized. The government has never convincingly argued to the contrary. The most bizarre aspect of this seizure is that the government itself apparently recognized the mistake shortly after the seizure, but unfortunately, it was too late.

## II. THE TAKING

■ The government contends that the boat was not taken within the meaning of the Fifth Amendment because GSA did not have authority to seize PTF–26.[4] Inherent in this position is the compounding of two errors. First, this is not a forfeiture case.[5] In a forfeiture case the government's authority is important because of the significant civil liberties at stake when the government physically takes property from an individual as a penalty for a crime or fraud. The common law tradition is very jealous of this power. It must only be done with proper authority, otherwise the seizure or physical taking is itself identical to the crime it seeks to discourage. *In rem* forfeitures of contraband or goods directly used in crime present less danger to civil liberties because the type of

object or the circumstances involved circumscribe government conduct. There are of course, important Fourth Amendment concerns, but these relate to the broader fundamental rights of the person, not the seizure action or confiscation itself.

In this case we have a dispute over the ownership of a property interest. The government's seizure was based not on a forfeiture claim and its penalty, but rather on the government's mistaken belief that it had a right to the property based on the surplus property rules. This is no different than the flooding cases where the government does not appreciate the effects of its actions on the rights of others. It is also analogous to a title dispute over land. Only, in such a dispute, the private parties generally do not have the ability to take control of the land prior to a judicial resolution. When the government is involved, the Fifth Amendment provides the private party with compensation for the government's exercise of that power.

Second, the government confuses the issue of the authority to seize. In forfeitures, the question of authority is also important because the government should not be held liable if its agents act illegally or beyond the scope of their authority or their jobs. The agents should be held personally liable. This is particularly important in *in personam* forfeitures which create dangers to individual liberty of serious proportions. Here, no one has contended that the government agents acted beyond the scope of their duties. The actions taken were completely proper. Unfortunately, in light of the correct interpretation of the law, the action's consequences

4. Agents of the federal government physically seized the PT boat in question pursuant to GSA's legal authority under 41 C.F.R. § 101–44.117 to seize property on behalf of the United States. Recovery of Property for Federal Use—

> Occasionally, Federal agencies may develop on an exigency basis requirements for personal property items derived from surplus sources in the possession of a State agency. The State agency should cooperate with GSA in the recovery of property to fulfill Federal needs. The transfer will be subject to payment by the acquiring agency of the costs of care and handling ... incurred by the State agency initially acquiring the property.

5. The government here does not claim to take the boat as a penalty for violation of any law. In fact, they claim the GSA had no basis of authority to take the boat. Another difference is that in a forfeiture case, the government has no interest in the property itself but for the fact that it was involved in a crime. In the instant case, the government allegedly desired the boat because of the beneficial contract plaintiff had with the Navy. Thus, this case can be readily distinguished from the recent decision in *Crocker v. United States*, 37 Fed. Cl. 191 (1997), aff'd 125 F.3d 1475 (1997), which holds that a plaintiff must go to district court to correct a defective exercise of sovereign powers with respect to forfeitures.

were to deprive the plaintiff of a valuable property interest.

There is also the argument here, and it has been made by the government elsewhere, that because the action was not legally supported, the plaintiff has no Fifth Amendment remedy but must seek the property's return under an Administrative Procedure Act (APA) claim in district court. That is not the law. The meaning of the statement "[t]he Tucker Act suit in the Claims Court is not, however, available to recover damages for unauthorized acts of government officials" is not that the seizure must have been proper or there is no relief. *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), *on remand,* 21 Cl.Ct. 161 (1990), *judgment entered,* 23 Cl.Ct. 653 (1991), *judgment vacated,* 18 F.3d 1560 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). It would be a bizarre consequence that would allow the government to profit from its own error. Rather, the statement is intended to make clear that when litigants come to this court they must accept the legal reality of the taking, and may only seek just compensation. They may not seek the property back nor seek consequential damages. They may only seek just compensation since the Fifth Amendment allows the government to take property with few limits, only, however, it must pay for that property at the market value.

The fact that a plaintiff may have another remedy against the government, namely reversing the seizure action in a district court, has never been held to be a defense to an action in this court. In fact, it is quite the opposite, as the Supreme Court noted in *Preseault v. Interstate Commerce Commission,* " 'takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.'... The Tucker Act provided jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract." [6] 494 U.S. 1, 11–12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990)(citing *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). Thus, a remedy in the district court may be conditioned on the failure of a just compensation remedy in this court.

In the familiar law school property hypothetical, the rightful property owner may elect at his or her option to treat the thief as a purchaser, thus electing the contract over the tort remedy. Thus, the government's theory that the United States is not liable because GSA acted contrary to law or incorrectly in seizing the boat is without any substantial trace of logic. It is hardly a defense for the government to say it was wrong. A plaintiff may elect to come to this court for monetary damages as long as they are not challenging the government's actions. This has long been recognized in the name given to these cases in the Court of Claims: inverse condemnation. A plaintiff does not have to go to every court that is imaginable.

The issue therefore is not whether GSA had statutory or regulatory authority to specifically engage in takings. Rather, the question is whether the GSA, a government agency authorized to hold property, seized plaintiff's boat with no valid claim of title.

---

**6.** This understanding of Tucker Act jurisdiction has long been recognized in this court. In granting a government agency the authority to conduct its statutory mandate, through "activities that may or may not infringe on property rights yet in making no provision for payment if they do, Congress must be deemed to hope that it will not infringe, but to intend that if it does, the Tucker Act ... will be the safety net that will save any violation of the Fifth Amendment from occurring...." *Armijo v. United States,* 229 Ct. Cl. 34, 663 F.2d 90, 95 (1981). Regardless of the United States intentions, "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). "[I]f the authorized action ... does constitute a taking of property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims." *Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 21, 60 S.Ct. 413, 84 L.Ed. 554 (1940).

At no time did the government argue that this was an improper act of certain government employees beyond the scope of their authority or position. If government officials are acting within the scope of their authority when they seize property, it does not matter whether those officials have the explicit authority to spend money on behalf of the United States. If it was a mistake to seize that boat, then it was a mistake of the United States for which the government is liable under the Tucker Act. When there has been an authorized physical seizure of property, and that seizure was substantively wrong, a plaintiff may elect to come to this court and assert a taking claim. Plaintiff in this case accepts that the government has taken their property; it just wants to be compensated for it. By acceptance it is meant not that the property was taken by right, but rather that plaintiff waives any claim for any damages for tortious or arbitrary and capricious conduct or for any type of equitable relief.

In sum, the court finds the government's authority argument unavailing. Clearly, the Tucker Act in conjunction with the Fifth Amendment provides a safety net for plaintiff in the circumstances of a seizure that should never have happened. In the absence of any evidence that contradicts the government's seizure of PTF–26, the court finds that the government's action was a taking for which just compensation is required.

## III. DAMAGES

Plaintiff in its amended complaint is seeking damages of $1,932,389.40 plus interest for the taking of the PTF–26 and inventory of spare parts, supplies and equipment. Plaintiff argued that the boat had an appraised market value of $675,000 at the time of the seizure and that the parts inventory had a fair market value of $1,357,389.40.

■ When property is taken by the government, the proper measure of just compensation is the property's fair market value at the time of the taking. *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 160 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994). The court has defined "fair market value," as:

The most probable price, as of a specified date, in cash. or in terms equivalent to case, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

*Loveladies Harbor*, 21 Cl.Ct. at 156 (citing the American Institute of Real Estate Appraisers, The Appraisal of Real Estate 19 (9th ed.1987)). At trial the experts testified that "fair market value" in the boat market is based on a willing seller and willing buyer exchange. The court finds that the same "fair market value" analysis, as quoted above and modified by a "willing buyer and willing seller," analysis applies to the personal property at issue in this case.

■ In addition to not being a case about real property, this case also differs from many takings cases because some of the property involved is a leasehold interest. In many takings cases a leasehold interest would be of lesser value than a fee simple interest. In this case the taking of the leasehold interest (the government seizure of the boat) stripped the property of all effective value. The boat's value was based on its use; there was no residual value as evidenced by the boat's ultimate disposition. A boat, unlike other property, can deteriorate rapidly when its systems and maintenance are abandoned. As a result of the peculiarity of the property interest in this case, the court will consider the value of the leasehold interest as the equivalent of the value of the PTF–26. The market in this case is limited to what a person who had the contract with the Navy or a similar use would pay for the boat.

During the trial, appraisers for the government and plaintiff presented widely differing opinions as to the value of PTF–26 and to the mechanical parts that were seized by the government. The property interest in the parts was not a leasehold interest. Mr. Raymond Nulf, who testified on behalf of the plaintiff, valued the boat, in an assignment to certify that work was being done on the vessel, as worth $100,000–110,000 (in 1987)

for salvage or scrap value. At the time of that valuation, the vessel was undergoing repairs and was non-operable. In 1990, when the boat was operating, Mr. Nulf testified that the fair market value of the boat was $555,000–565,000, based on the combined value of the boat's hull, engines, civilian electronics, specialized electronics, and miscellaneous items (auxiliary engines, shaft, propellers, and electrical equipment). Mr. Nulf valued the hull and the engines at 20 and 10 percent, respectively, of what they could have been built for in 1990. Though Mr. Nulf opined that it would be difficult to sell the boat as a unit on the commercial market, its larger component parts could quite feasibly be sold independently, yielding separate sums that (if added) would approximate his total estimation of the value of PTF–26. Further, Mr. Nulf testified that the value of the spare parts that were seized was $3,380,-331.

In contrast, Mr. David L. Grant, who testified on behalf of the government, valued the boat as being worth $100,000 in 1990. Mr. Grant indicated many problems with the PTF–26 due to the difficulty of finding a commercial use for its "exotic machinery," and licensing peculiarities. Mr. Grant, however, with the exception of his statement that an engine similar to the ones in the boat could have been purchased (in 1995) for $40,-000, did not consider the value of each component part of the boat if sold on the open market. He also stated that, despite Osprey's investment of roughly $200,000 in the boat between 1987 and 1990, the boat would properly have been valued at $100,000 in both years.

The court found Mr. Nulf's testimony as to the value of the PTF–26 more credible than Mr. Grant's. Mr. Nulf's method of valuation accounted for what would most likely be the rational behavior of an owner selling the boat on the market, i.e., to maximize salvage value by selling the component parts of the boat. Also, the fact that a similar vessel in *Boats and Harbors* was listed for sale at $388,000 supports Mr. Nulf's valuation more closely than Mr. Grant's. Furthermore, Mr. Nulf had appraised the PTF–26's value as scrap at $100,000 in 1987. Based upon the fact that in 1990 the boat was operating and had been improved since 1987, as well as other evidence indicating the vessel was worth more than $100,000, an appraisal value of $100,000 in 1990 is not very realistic. After hearing expert testimony and weighing the evidence the court finds that (as seized) the fair market value of the boat, PTF–26, was $450,000.

The appraisers also varied greatly on their estimate of the value of the spare parts that were seized by the government. Mr. Bradley (who directed Modoc Technical Services' repair of PTF–26 in 1985) testified for the plaintiff, using Osprey's and federal government acquisition cost figures and (where a market price could be obtained for an item) fair market value, that the inventory of spare parts seized by the government was worth, cumulatively, over $3,000,000. In fact, Mr. Bradley estimated the value of the spare parts for the boat's Napier engines alone (upon seizure) to be almost three million dollars (Mr. Nulf also testified that the parts were worth more than $3 million). Unfortunately, the market for Napier engine parts is apparently quite limited. Mr. Bradley could not express an opinion on whether the federal government's list prices for acquisition of the Napier parts (1988 figures) overestimate or underestimate the current value of those parts. Further, Mr. Bradley essentially agreed with defense counsel's assertion on cross-examination that a significant number of the inventory items valued as part of the spare parts seized were in fact illegal for civilian use, and thus no market existed for such parts. Also, while PTF–26 was under repair at the Port of Newport, an undetermined quantity of parts were stolen, raising the problem of double accounting: it is difficult to discern from the record which items listed in plaintiff's relevant exhibit were inventory input into the boat and which were stolen and thus ultimately not seized by the government. Mr. Grant testified (for the government) that the parts, despite the acquisition costs, were worth only a scrap value.

Clearly, not all of the parts were mere scrap; however, none of the parts were as valuable as plaintiff's witnesses suggested, despite the acquisition cost bases for their

estimates. The court notes that, if acquisition cost basis were the proper method of valuation, the PTF–26 would presumptively be valued at over $2,000,000, the government figure for "unit acquisition cost." As set forth above, plaintiff's experts arrived at an eminently more reasonable valuation based upon fair market value of component parts, a valuation supported adequately by figures in a trade publication. Similarly, acquisition cost cannot serve as the presumptive basis for the valuation of the spare parts at issue in this case. Surplus parts purchased through the government would not be worth as much as the acquisition cost of new parts, nor should surplus parts be considered equal in value to new parts' on the open market. Further, the character of the market for the parts in question is uncertain. Whereas plaintiff's witnesses assumed that ready buyers would pay premium prices for scarce parts for specialized functions, neither the number nor purchasing habits of the hypothetical buyers was adequately explicated by either party's witnesses. Finally, there was evidently a total lack of a market for several of plaintiff's parts, and some quantity of parts was in fact stolen prior to seizure. All of the above factors, apparent upon the record, operate to significantly reduce the amount claimed by plaintiffs as proper compensation for their lost parts. Thus, the court finds that the value of the spare parts was closer to their scrap value than their acquisition costs. Based upon the testimony and examining the evidence the court finds the fair market value of the parts as $100,-000.

## CONCLUSION

Based on the foregoing, the court concludes that the government seizure of PTF–26 and the spare parts was a taking of plaintiff's property as of October 3, 1990. To fulfill the mandate of the Fifth Amendment, the court awards plaintiff the amount of $550,000 plus compound interest from the date of the taking as a measure of just compensation. The plaintiff shall file any claim for attorneys fees and costs pursuant to 42 U.S.C. § 4654 within 90 days from the filing of this opinion.

**IT IS SO ORDERED.**